1
2
3
4
5
6
7
8
9
10          **UNITED STATES DISTRICT COURT**
11        **SOUTHERN DISTRICT OF CALIFORNIA**
12
13   ALBERTO PASTRANA,                          CASE NO: 06-CV-1779 W(AJB)
14                              Plaintiff,       **ORDER GRANTING IN-PART**
15                                               **AND DENYING IN-PART**
            v.                                   **DEFENDANTS' MOTIONS**
16                                               **FOR SUMMARY JUDGMENT**
17   LOCAL 9509, COMMUNICATIONS                  **[DOC. NOS. 71, 74]**
18   WORKERS OF AMERICA, AFL-CIO, a
     Labor Organization; et al.,
19
20                          Defendants.

21        Pending before the Court are Defendants' summary-judgment motions.  The Court
22   decides the matter on the papers submitted and without oral argument.  See Civil Local
23   Rule 7.1(d.1).   For the reasons stated below, the Court **GRANTS IN-PART** and
24   **DENIES IN-PART** the motions (Doc. Nos. 71, 74).
25   //
26   //
27   //
28

06cv1779W

1    I.    **BACKGROUND**

2         Defendant Pacific Bell Telephone Company ("PacBell") is a regulated public utility,

3    and is a subsidiary of AT&T, Inc.  (*PacBell's MSJ*, 1:1–2; *Third Amended Complaint* ("TAC"),

4    ¶ 4.)    Defendant Communication Workers of America, AFL-CIO ("CWA") is an

5    international union that represents over 700,000 workers in the telecommunications and

6    other industries. (*Union's MSJ*, 2:2–4; *TAC*, ¶ 7.) Defendant Local 9509, Communications

7    Workers  of  America,  AFL-CIO  ("Local  9509")  represents  workers  in  the

8    telecommunications industry in the San Diego area.  (*Union's MSJ*, 2:18–19; *TAC*, ¶ 5.)

9    Local 9509 and CWA (collectively, the "Union") are the recognized collective bargaining

10   representative for certain PacBell employees.  (*TAC*, ¶ 11.)  During the relevant period,

11   Plaintiff Alberto Pastrana was a PacBell employee and Union member.  (*Id.*)

12        On August 25, 1983, Pastrana pled no contest to one felony count of Lewd and

13   Lascivious Acts Upon a Minor.  (*Pastrana's Notice of Lodgement* ("NOL"), Ex. 2.)  Pastrana

14   was sentenced to eleven months in custody and three years probation.  (*Id.*)

15        Approximately 14 years after his no contest plea, in January 1997, Pastrana applied

16   for a job with PacBell.  (*Union's Sep. State.*, Material Fact ("MF") 6; *Pastrana's NOL*, Ex. 6

17   at 1.)  The employment application asked about any criminal record.  Pastrana did not

18   respond to the question.  (*Id.*, 3.)  However, during his interview, Pastrana disclosed his

19   conviction.  (*PacBell's Sep. State*, MF 30–31.)

20        Pastrana was hired as a cutover technician and eventually transferred to a service

21   technician position.  (*PacBell's Sep. State.*, MF 34.)  During his time with PacBell, Pastrana

22   generally received satisfactory reviews.  (*Pastrana's NOL*, Ex. 12 [Green Depo.] at 16:5–7.)

23        On February 1, 2005, Connie Green, Area Manager of Installation and Repair, was

24   told by another PacBell supervisor that an employee was listed on a website for registered

25   sex offenders, known as the Megan's Law website.  (*Pastrana's NOL*, Ex. 12 [Green Depo.]

26   at 16:8– 17:19.)  Green and another PacBell area manager looked on the website and found

27   Pastrana's picture.  (*Id.*, 19:3–12, 21:13–14.)

28

06cv1779W

Green suspected that Pastrana had failed to disclose his conviction when hired, and should be suspended. (*Pastrana's NOL*, Ex. 12 [Green Depo.] at 19:13–22, 23:4–25:14.) Green, therefore, contacted the company's labor office for advice on suspending Pastrana. (*Id.*)  Green then contacted Buck Carter in PacBell's Asset Protection department to investigate. (*Id.*, 26:19–27:4.)  Later that day, Pastrana was suspended without pay. (*Id.*, 35:1–8, Ex. 1 [Pastrana Depo.] at 346:4–10.)

After conducting an investigation, Carter concluded that Pastrana disclosed his conviction before being hired, and that Pastrana did not violate PacBell's Business Code of Conduct. (*Pastrana's NOL*, Ex. 14 [Carter Depo.] at 71:22–25, 86:4–22.)  Despite Carter's conclusion, Green believed that the conviction provided PacBell with just cause to terminate Pastrana. (*Id.*, Ex. 12 [Green Depo.] at 83:20–84:2, 94:7–12; Ex. 24.)  On or about February 18, 2005, PacBell discharged Pastrana.

On March 1, 2005, the Union filed a grievance on behalf of Pastrana challenging his termination. (*PacBell's Sep. State.*, MF 4.)  The Collective Bargaining Agreement (CBA) provides for a three-step grievance process for any discharged "regular employee." (*Id.*, MF 5; *Reynold's Decl.*, Ex. A [CBA] § 7.05A1–3.)  Each step consists of a meeting between the Union–as the employee's representative–and escalating levels of PacBell's management. (*Reynold's Decl.*, Ex. A § 7.05A1–3.)  If the grievance is not resolved at any of the meetings, the Union may elect to arbitrate the grievance. (*Id.*, §§ 7.08, 7.10A.)

Nathan Cowell was Pastrana's Union representative throughout the grievance process.  Cowell attended each of the three step-meetings.  The final Step III meeting occurred on June 13, 2005.  At the conclusion of the meeting, PacBell refused to reinstate Pastrana.  On June 14, 2005, PacBell formally denied Pastrana's grievance in a letter sent to the Union, as Pastrana's representative. (*Smith's Decl.*, ¶9; *PacBell's Notice of Lodgement* ("NOL"), Ex. G at 1.)

After the Step III meeting, Cowell telephoned Pastrana and told him about the company's position.  Thereafter, the Union alleges that Cowell met with Bob Borunda

06cv1779W

(Local 9509's Chief Steward) and Sandra Martinez (Local 9509's President) to discuss whether to proceed to arbitration. (*Union's MSJ*, 10:16–11:3.) Given the nature of Pastrana's conviction and the fact that the Union had lost three previous arbitrations, the decision was made not to pursue arbitration. (*Id.*) The Union alleges that it notified Pastrana about the decision on numerous occasions in 2005. Pastrana alleges that he was not notified until March 2, 2006. (*Opp.'n to Union's MSJ*, p.19:17–19; *Keramati's Decl.*, ¶ 4; *Pastran's Decl.*, ¶ 7.)

On September 1, 2006, Pastrana filed this lawsuit against the Union and PacBell. On January 4, 2008, Pastrana filed the Third Amended Complaint, which asserts three causes of action for: (1) unlawful discharge and breach of the duty of fair representation in violation of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185; (2) violation of California Penal Code § 290.46; and (3) wrongful termination in violation of public policy (predicated on the California Penal Code violation). Defendants' motions followed.[1]

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

---

[1]In his opposition to the Union's summary-judgment motion, Pastrana has agreed to dismiss the Union from the second claim for violation of Penal Code § 290.46. (*Opp'n to Union's MSJ*, 27:8–11.)

06cv1779W

1    A party seeking summary judgment always bears the initial burden of establishing
2  the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party
3  can satisfy this burden in two ways: (1) by presenting evidence that negates an essential
4  element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party
5  failed to make a showing sufficient to establish an element essential to that party's case on
6  which that party will bear the burden of proof at trial.  Id. at 322–23.  "Disputes over
7  irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec.
8  Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

9    "The district court may limit its review to the documents submitted for the purpose
10  of summary judgment and those parts of the record specifically referenced therein."
11  Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the
12  court is not obligated "to scour the record in search of a genuine issue of triable fact."
13  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co.,
14  55 F.3d 247, 251 (7th Cir. 1995)).  If the moving party fails to discharge this initial burden,
15  summary judgment must be denied and the court need not consider the nonmoving party's
16  evidence.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159–60 (1970).

17    If the moving party meets this initial burden, the nonmoving party cannot defeat
18  summary judgment merely by demonstrating "that there is some metaphysical doubt as to
19  the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574,
20  586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing
21  Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of
22  the nonmoving party's position is not sufficient.").  Rather, the nonmoving party must "go
23  beyond the pleadings and by her own affidavits, or by 'the depositions, answers to
24  interrogatories, and admissions on file,' designate 'specific facts showing that there is a
25  genuine issue for trial.'"  Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

26    When making this determination, the court must view all inferences drawn from the
27  underlying facts in the light most favorable to the nonmoving party.  See Matsushita, 475
28

06cv1779W

1  U.S. at 587.  "Credibility determinations, the weighing of evidence, and the drawing of

2  legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or

3  she] is ruling on a motion for summary judgment."  <u>Anderson</u>, 477 U.S. at 255.

4

5  **III.  <u>DISCUSSION</u>**

6      **A.  <u>Statute of Limitations.</u>**

7      Pastrana's first cause of action alleges that PacBell terminated him without just cause

8  in violation of the CBA, and that the Union failed to fairly represent him in the grievance.

9  The applicable limitations period is six months.  29 U.S.C. § 160(b); <u>DelCostello v. Int'l</u>

10  <u>Bhd. of Teamsters</u>, 462 U.S. 151 (1983).  The statute begins to run when the employee

11  knows, or reasonably should have known, the union breached its duty of fair

12  representation.  <u>Galindo v. Stoody Co.</u>, 793 F.2d 1502, 1509 (9th Cir. 1986).  Where, as

13  here, the claim is based on the Union's failure to pursue arbitration on behalf of the

14  employee, the reasonable knowledge is imputed and limitations period starts as of the

15  CBA's deadline for electing arbitration.  <u>Cook v. Columbian Chemicals Co.</u>, 997 F.2d 1239,

16  1241 (8th Cir. 1993); <u>Shapiro v. Cook United, Inc.</u> 762 49, 51 (6th Cir. 1985).

17      Defendants contend that Pastrana's claims are time barred because the Union

18  decided in June 2005 not to pursue arbitration, yet Pastrana did not file this lawsuit until

19  September 2006.  Defendants advance two theories to establish that Pastrana knew or

20  should have known that by July 2005, the Union decided not to pursue arbitration.  First,

21  Defendants contend that Pastrana had actual knowledge because he was specifically

22  informed about the Union's decision.  Second, Defendants allege that the CBA provided

23  Pastrana with constructive knowledge that the Union's deadline for deciding whether to

24  arbitrate expired in July 2005.  For the reasons explained below, the Court finds that

25  disputed issues of fact exist as to each theory.

26

27          **1.  <u>There is a dispute regarding when the Union actually notified</u>**

28                       **<u>Pastrana about the decision not to pursue arbitration.</u>**

06cv1779W

The Union alleges that in June 2005, the decision was made not to pursue arbitration.  Thereafter, Defendants contend that the Union informed Pastrana about the decision on multiple occasions.

According to the Defendants, Cowell told Pastrana about the decision not to pursue arbitration sometime between June 14 and June 24, 2005, and again in late November or early December 2005.  (*Union's MSJ*, p.14:18–22; *Union's Sep. State.*, *MF* 49, 53.) Additionally, on February 8, 2006, Defendants allege that CWA representative Laura Reynolds telephoned Pastrana, who admitted that Cowell informed him that the grievance was not going forward, that it was being closed out and would not be arbitrated.  (*Union's MSJ*, p.14:23–15:7; *Union's Sep. State.*, MF 57.)  Thereafter, on February 10 and 28, 2006, Reynolds allegedly had telephone conversations with Pastrana and his attorney, during which time Reynolds confirmed the Union's decision not to pursue arbitration.  Based on these facts, Defendants contend that the limitations period began no later than February 28, 2006.

Pastrana denies each of the Union's factual allegations.  He contends that he first learned about the Union's decision not to arbitrate on March 2, 2006, when Reynold's informed Pastrana's attorney about the decision.  (*Opp.'n to Union's MSJ*, p.19:17–19; *Keramati's Decl.*, ¶ 4; *Pastran's Decl.*, ¶ 7.)  Defendants, however, argue that Pastrana's denial is based on a declaration wherein "Plaintiff conveniently alters his deposition testimony." (*Union's Reply*, 1:11–15.)  But neither Defendant has cited any portion of Pastrana's deposition transcript that contradicts the contention that he did not learn about the Union's decision until March 2, 2008.

The Union's contention that Cowell notified Pastrana sometime between June 14 and 24, 2005, and again in late November or early December 2005, is not based on Pastrana's deposition testimony.  Rather, these factual allegations are based entirely on Cowell's declaration and deposition testimony.  (*See Union's Sep. State.*, MF 49 at 22:15–17, MF 53 at 23:15–25.)  Moreover, the Union has not identified anywhere in Pastrana's deposition transcript where he acknowledges that Cowell told him about the Union's

06cv1779W

1  decision not to arbitrate. (*See Union's Concordance*, MF 49 at 12:7–14:16, MF 53 at 19:7–19.[2])

2  Thus, the Union has not established that Pastrana provided conflicting testimony in his

3  deposition and declaration.[3]

4  Similarly, the contention that on February 8, 2006 Pastrana admitted to Reynolds

5  that he knew about the Union's decision is based on Reynold's declaration and deposition

6  testimony. (*Union's Sep. State.*, MF 57 at 25:12–27.) At paragraph 9 in his declaration,

7  Pastrana denies Reynold's statement. (*Pastrana*'s *Decl.*, ¶ 9.) And the Union does not

8  identify any conflicting testimony in Pastrana's deposition transcript. (*Union's Concordance*,

9  MF 57 at 27:22–29:6.) Instead, the Union argues that Pastrana's denial is insufficient to

10 create a disputed issue of fact because during his deposition, Pastrana testified that he

11 remembered "very little, other than I was not happy with whatever answers I got at the

12 time." (*Union's Reply*, 1, fn. 4, citing *Pastrana's Depo.* 535:2–5, 537:18–538:6.) The Court

13 would be speculating if it were to construe this vague statement as an acknowledgment that

14 Pastrana knew the Union decided not to pursue arbitration. At best, Pastrana's delayed

15 recall raises a potential credibility issue for the jury.

16 The Union's claim that on February 10 and 28 Reynolds informed Pastrana and his

17 attorney about the Union's decision is also based solely on Reynold's testimony. (*See*

18 *Union's Sep. State.*, MF 59 at 26:9–25.) Pastrana and his attorney both deny Reynold's

19 statement. (*Keramati's Decl.* ¶¶ 2, 3; *Pastrana's Decl.* ¶ 9.) The Union asserts that Pastrana

20

21 [2]With regard to material fact 49, the Union contends that Pastrana's deposition testimony

22 is inconsistent with his declaration that Cowell informed Pastrana that the Union was "going to take the grievance all the way up to arbitration." (*See Union's Concordance* 12:7–14:16.) But

23 regardless of whether Cowell made the statement, it does not establish when Pastrana learned

24 about the Union's decision. As for material fact 53, the Union does not identify any inconsistencies between Pastrana's declaration and his deposition testimony. (*Id.* 19:7–19.)

25

26 [3]The Union relies on <u>Radobenko v. Automated Equipment</u>, 520 F.2d 540 (9th Cir. 1975) in support of its argument. (*Id.* p. 1:16–17.) In <u>Radoben</u>, the Ninth Circuit held that a party may

27 not "create his own issue of fact by an affidavit contradicting his prior deposition testimony. . .." <u>Id.</u> at 544. Because the Union has not established that Pastrana's declaration contradicts his prior

28 deposition testimony, <u>Radoben</u> does not assist the Union.

06cv1779W

1    and his attorney's statements in their declaration are "off-point and irrelevant." (*Union's*
2    *Concordance*, MF 59 at 30:7–31:8.) The Union's assertion is absurd. Keramati declares that
3    during the February 10, 2006 phone call, "Reynolds did not inform me that the local had
4    decided not to pursue Pastrana's grievance." (*Keramati's Decl.* ¶ 2.) This statement is clearly
5    on point and relevant to the material fact raised. Moreover, the Union has again failed to
6    demonstrate that Pastrana's or his attorney's declaration are contradicted by other
7    testimony.

8        Because disputed issues of material fact exist, Defendants' request for summary
9    judgment on this ground is denied.[4]

10

11        **2.    The CBA does not establish that Pastrana had constructive**
12            **knowledge about the Union's decision.**

13        Defendants also argue that because Pastrana had a copy of the CBA and knew that
14   PacBell had denied reinstatement at the Step III meeting, Pastrana should have known that
15   the Union's 35-day deadline for selecting arbitration expired on July 22, 2005. The Court
16   is not persuaded.

17        There is no dispute that Pastrana was given a copy of the CBA. (*PacBell's Sep. State.*,
18   MF 6.) While Pastrana denies referring to the CBA, as a Union member Pastrana had a
19   duty to know his appeal rights. <u>Newgent v. Modine Mfg. Co.</u>, 495 F.2d 919, 927–28 (7th
20   Cir. 1974); <u>Cook v Columbian Chemicals Co.</u>, 997 F.2d 1239, 1241 (8th Cir. 1993)
21   ("constructive notice of the existence of [union members]'s cause of action [against union]
22   could be imputed to him by operation of the collective bargaining agreement under which
23   he worked.") Nevertheless, based on the CBA's terms, the Court cannot find that Pastrana
24   should have known the Union's deadline for choosing arbitration expired in July 2005.

25

26   _____

27        [4]The Union also contends that it is undisputed that on "June 24, 2005, Local 9509 advised
     Plaintiff by mail that his grievance would not be taken to arbitration." (*Union's Sep. State.*, MF 50.)
28   Pastrana disputes this fact. (*See Pastrana's Decl.*, 7.)

06cv1779W

1    The CBA provides that the Union and PacBell could extend the 35-day deadline for

2    deciding whether to pursue arbitration.   (*Reynold's Decl.*, Ex. A [CBA] § 7.10C.)

3    Additionally, Pastrana testified that after the Step III meeting, Cowell told him that the

4    "company's position had not changed, that they were refusing to settle and refusing to

5    reinstate me . . . that as far as [Cowell] was concerned, they – you know, they should settle

6    or reinstate me, *that he would continue to fight it*, but that if it went into arbitration, it would

7    be a long process, that I would need to be patient." (*Pastrana's NOL*, Ex. 1 [Pastrana

8    Depo.] at 435:9–436:6.)

9    A reasonable inference could be drawn from the CBA's terms and Cowell's alleged

10   statement that Pastrana believed the Union and PacBell agreed to extend the deadline

11   beyond July 2005 for deciding whether to pursue arbitration.  Such a belief would also be

12   consistent with Pastrana and his sister, Elvira Pastrana's, continued efforts after July 2005

13   to contact the Union regarding the status of Pastrana's grievance.[5]  For these reasons, the

14   Court cannot find, as a matter of law, that Pastrana knew by July 2005 that the Union

15   decided not to pursue arbitration.

16

17          **3.    Pastrana's claims against PacBell commenced at the same time**

18                  **as his claims against the Union.**

19   There is no dispute that after the Step III meeting, PacBell notified the Union of the

20   decision not to reinstate Pastrana.  (*Smith's Decl.*, ¶ 9; *PacBell's NOL*, Ex. G at 1.)  Nor is

21   there any dispute that under the CBA, PacBell was not allowed to have direct contact with

22   Pastrana, and thus was required to provide notice of its decision to the Union, as Pastrana's

23   representative.  (*Reynold's Decl.*, Ex. A [CBA] § 7.05F.)  PacBell therefore argues that the

24   Union's alleged failure to notify Pastrana about the arbitration decision does not impede

25   the commencement of the statute of limitations as to Pastrana's claims.  (*PacBell's MSJ*,

26   _____

27          [5]   For example, Pastrana's sister (who retired from PacBell and was a Union member)
     either contacted or attempted to contact the Union on August 30, 2005, September 28, 2005 and
28   October 6, 2005 (*Pastrana's NOL*, Ex. 31 [Elvira Pastrana Depo.] at 38:17–44:1.)

06cv1779W

7:7–21–23.)

In support of its position, PacBell relies on an unpublished Florida district court case, Brown v. SCM Corp., 120 L.R.R.M. (BNA) 3209 (1985).  In Brown, the court ruled that the union's belated notice of its decision not to arbitrate did not delay the running of the statute of limitations on the union member's claims against the company.  Brown, however, conflicts with several federal appellate decisions.

In Vadino v. A Valey Engineers, 903 F.2d 253 (3rd Cir. 1990), an employee filed suit against his former employee for breach of the collective bargaining agreement.  Among the issues considered was "whether the statute of limitations may be tolled as to the employer not only on the basis of its own actions and statements but also on the basis of assurances given by the Union representatives."  Id. at 261.  In holding that the Union's conduct could toll the employee's claims against the employer, the Third Circuit explained:

> A contrary holding would put the plaintiff in an untenable position because of the interconnection between the two claims.  If Vadino's [i.e., the employee's] cause of action against A. Valey [i.e., the employer] were to accrue at the time of the alleged breach of the collective bargaining agreement and before the futility of further appeals to the Union became apparent, Vadino's ability to file a section 301 suit against A. Valey would be ephemeral because such a claim could not be maintained until he could fairly allege that the Union refused to process his grievance. [Citation omitted.] The unfair representation claim is the necessary "condition precedent" to the employee's suit. [Citation omitted.]  Allowing the section 301 claim to be tolled until the unfair representation claim also accrues is consistent with the congressional goal of resolving labor disputes in the first instance through the collectively bargained grievance procedure, because the employee will be encouraged to persist in efforts to have the union act on his or her behalf.  Therefore, the employee's claim on the employer's alleged breach of the collective bargaining agreement is tolled until it was or should have been clear to the employee the union would not pursue the grievance. [Citations omitted.]

Id.; see also Butler v. Local Union 823, 514 F.2d 442 (8th Cir. 1972) (holding that claim against employer did not accrue until claim against union).

Although the Court has not found a Ninth Circuit decision evaluating the issue, Bliesner v. Communication Workers of America, 464 F.3d 910, 914 (9th Cir. 2006) cited

06cv1779W

1   Vadino with approval, and acknowledged that a claim for "breach of a duty of fair

2   representation by the union is a prerequisite to a successful suit against the employer for

3   a breach of the CBA." Id. at 914.  To the extent that the union's breach is a prerequisite

4   to the claim against the employer, the limitations period on Pastrana's claim against PacBell

5   did not accrue until Pastrana's claim against the Union accrued.  See also Hill v. Georgia

6   Power Co., 786 F.2d 1071, 1077 (11th Cir. 1986) (holding that an employee's cause of

7   action against the union and employer accrue simultaneously in a hybrid case).

8   Accordingly, PacBell's request for summary judgment based on the statute of limitations

9   is denied.

10

11          **B.      Breach of Duty of Fair Representation.**

12          A union breaches its duty of fair representation when its conduct toward a member

13   is "arbitrary, discriminatory, or in bad faith." Peterson v. Kennedy, 771 F.2d 1244, 1253

14   (9th 1985) (citing Vaca v. Sipes, 386 U.S. 171, 190 (1967)).  Negligence by the union in

15   handling a member's grievance is insufficient to constitute a breach of its duty.  Id.  A

16   union acts arbitrarily when it ignores a meritorious grievance or handles it in a perfunctory

17   manner.  Id. at 1253–1254.

18          The Union argues that it decided not to pursue arbitration based on the following

19   undisputed facts: (1) Pastrana was a convicted for child molestation and served jail time;

20   (2) PacBell had a policy of not hiring convicted felons; (3) Pastrana was hired in error;

21   (4) Pastrana's job involved going into customers' homes; and (5) PacBell terminated

22   Pastrana after discovering its error.  The Union also considered PacBell's expressed

23   concern about potential liability arising from permitting a convicted felon from entering

24   customers' homes; the probability that an arbitrator would look unfavorably on Pastrana's

25   claim; and recent arbitrations that the Union lost in cases viewed as stronger than

26   Pastrana's.  Based on these facts, the Union contends that its decision was neither arbitrary,

27   discriminatory or in bad faith.

28

06cv1779W

Among Pastrana's theories in opposition, Pastrana disputes the Union's contention that Cowell, Borunda and Martinez met in June 2005 and decided not to pursue arbitration. Because Pastrana's theory raises disputed issues of material fact, the Union's request for summary judgment of this claim must be denied.

Pastrana contends that in January 2006, he talked to Borunda, who stated that Pastrana's "grievance was poorly documented, that he believed the case was at the district and then provided Pastrana with the name of an attorney to contact." (*Opp'n to Union's MSJ*, 23:8–12, citing *Pastrana's Depo.* at 27–30, attached to *Pastrana's NOL*, Ex. 1.) Borunda denies that this conversation took place. However, on summary judgment, the Court must resolve all disputes in favor of the non-moving party. Assuming the conversation occurred, a reasonable inference may be drawn that Borunda's belief that the grievance was at the district suggests that he did not attend the June 2005 meeting; otherwise Borunda would have known that the local decided not to pursue arbitration.

Moreover, Pastrana's theory is also (arguably) supported by Linda Sexton's declaration. Sexton contends that on January 6, 2006, she talked to Amelia Sanborn, an Area Steward for the Union. (*Sexton's Decl.*, ¶10; *Obj. to Sexton's Decl.*, ¶4.) During that conversation, Sanborn allegedly stated,

> there was a lot of excitement at the local, that Mr. Borunda had not done anything with a grievance of an outside tech who was fired and that Mr. Borunda was now in hot water. [Sanborn] stated that Mr. Borunda had failed to send the grievance to arbitration and that the grievance had timed out.

(*Sexton's Decl.*, ¶ 10.[6]) Although Sanborn did not identify Pastrana as the "outside tech

---

[6]The Union objects to Sexton's declaration on a number of grounds. Because the Court is relying only on ¶ 10, the Court will deny the objection to the other paragraphs as moot.

As for the Union's objection to ¶10, at this juncture in the case, the Court finds Sexton's testimony admissible as a party admission. The parties do not dispute that when the statement was made, Sanborn handled grievances for the Union. As such, her statement about Borunda's handling of Pastrana's grievance appears to be within the scope of her employment. See Fed. R. Evid. 801(d)(2)(D) ("A statement is not hearsay if [it] is offered against a party and is . . . a statement by the party's . . . servant concerning a matter within the scope of the . . . employment.")

06cv1779W

1    who was fired," a reasonable inference could be drawn that she was referring to Pastrana.

2        Pastrana's theory raises disputed issues of material fact that require credibility

3    determinations and weighing evidence. Accordingly, the Court finds that the Union is not

4    entitled to summary judgment on this ground.

5

6        **C.    PacBell Lacked Good Cause to Terminate Pastrana.**

7        The CBA provides that employees cannot be terminated without just cause.

8    (*Reynold's Decl.*, Ex. A [CBA] §§ Art. 7.12B, 7.19A.) Because the CBA does not define just

9    cause, the parties rely on California law, which defines just cause as a fair and honest reason

10   for discharge. Pugh v. See's Candies, Inc., 116 Cal.App.3d 311, 330 (1981).

11       PacBell argues that Pastrana's conviction, and the fact that his work required him

12   to enter customer's homes, constitutes just cause. (*PacBell's MSJ*, 15:15–21.) PacBell

13   further argues that "the fact Pastrana's criminal behavior occurred before his hire" does

14   not preclude a just cause finding. (*Id.*, 13, 15–17.) The Court is not persuaded under the

15   facts of this case.

16       PacBell relies on College of St. Scholastica, 96 L.A. 250 (1991) (*PacBell's NOL*, Ex.

17   LL at 462) to support the argument that pre-employment misconduct may constitute just

18   cause. PacBell's reliance on that case is misplaced.

19       In College of St. Scholastica, the grievant was hired as a janitor by the College. As

20   a janitor, the grievant had keys to the student residence halls. Four months after he was

21   hired, the College learned that the grievant was charged with domestic abuse and criminal

22   sexual conduct five years earlier. Id., 96 L.A. at 246. During the investigation that

23   followed, the College also learned that after being hired, the grievant was again charged

24   with domestic abuse. The grievant was eventually terminated.

25   _____

26       The Court recognizes the Union's contention that because Sanborn handled FMLA
     grievances, her statements were outside the scope of her duties. But the Union cites no evidence

27   to establish the scope of Sanborn's duties. As the moving party, the Court resolves the uncertainty
     against the Union. If, however, at trial the Union establishes that Sanborn's statements were

28   outside the scope of her duties, such testimony would not be admissible.

In finding that the College had just cause, the arbitrator first found that because the College was not aware of the conviction at the time of hiring, the College did not waive the right to consider the conviction in deciding whether to terminate the grievant. Id. 96 L.A. at 250. Also relevant in the arbitrator's decision was the amount of time that elapsed between the conviction and hiring:

> If the grievant had not just in March of 1990 [after being hired] engaged in domestic abuse, which is in essence aggressive and physical conduct against his wife . . ., I probably would not have been as concerned regarding his misconduct back in 1984. However, the recent occurrence indicates to me that he yet retains aggressive feelings against the female gender and thus is not an employee who can be trusted and would be safe in an environment involving substantial number of females as at the College.

Id. 252. Finally, the arbitrator also recognized that the grievant's length of employment was important: "If the grievant had had [sic] an extended period of service with the Employer, I would have given him a greater amount of consideration, *even to the extent of reinstatement* because he would have had a greater investment in the position and in his job and would have demonstrated that he had surmounted his prior conduct and was not an unreasonable risk." Id. at 254 (emphasis added).

It is doubtful that Pastrana would have been terminated under the reasoning used in College of St. Scholastica. Here, there is no dispute that before Pastrana was hired, he disclosed his conviction to PacBell. (*PacBell's Sep. State.*, MF 30–31.) PacBell, therefore, arguably waived the right to rely solely, if at all, on his conviction to establish just cause.

Additionally, unlike the grievant in College of St. Scholastica, Pastrana's conviction occurred 14 years before he was hired, and more than 20 years before he was fired. (*Pastrana's NOL*, Ex. 2, Ex. 6 at 1.) While the Court believes that PacBell may have been justified in removing Pastrana from a position in which he was entering customer's homes, PacBell may have had an obligation to attempt to find Pastrana another position within the company. This is particularly true given Pastrana's investment in the company in terms of his years of service. And as the arbitrator in College of St. Scholastica suggests, the significant lapse in time between Pastrana's conviction and his termination (as well as the

nature of the crime he was charged with) indicates that he was not a threat to other PacBell employees.

In addition, other facts suggest that PacBell lacked just cause to terminate Pastrana. First, there is no dispute that after conducting his investigation, Buck Carter determined that Pastrana did not violate PacBell's code of conduct. (*Pastrana's NOL*, Ex. 14 [Carter Depo.] at 71:22–25, 86:4–22.)   Second, the Union members involved in evaluating Pastrana's grievance admitted that they did not believe PacBell had just cause. (*PacBell's NOL*, Ex. F [Cowell Depo.] at 225:22–226, Ex. H [Borunda Depo.] at 81:19–82:6.)  Third, PacBell appears to concede that Pastrana's conviction did not constitute just cause when evaluated under the company's seven-step analysis for evaluating just cause. (*See PacBell's Reply*, 6:22–24.)  Instead, PacBell argues that the test is not applicable because it pertains only "to cases in which the employee has committed on the job misconduct, which is not at issue here."  (*Id.*)

Assuming this contention is accurate, PacBell fails to identify any alternative test that would be applicable to this case.  Instead, PacBell cites a number of decisions, which involved off-duty misconduct that occurred during the time of employment. (See e.g. Taylor v. United States Civil Service Commission, 374 F.2d 466 (9th Cir. 1967) (dismissed by U.S. Air Force for off-duty misconduct); Hayes v. Dept. of the Navy, 727 F.2d 1535 (Fed. Cir. 1984) (off-duty misconduct after being employed for approximately 8 years). Because this case involves a pre-employment conviction that was disclosed before being hired, those cases simply do not apply.

PacBell knew about Pastrana's misconduct before he was hired.  There is no evidence before the Court that during Pastrana's employment, PacBell received any complaints regarding Pastrana.  After nearly ten years of service, Pastrana was discharged for the previously disclosed twenty-year old conviction.  No attempt was made to reassign Pastrana.  No severance was offered to Pastrana.  Under these undisputed facts, Pastrana's discharge was not fair and honest, and thus not based on just cause.

06cv1779W

**D.     The After Acquired Evidence Doctrine Limits Pastrana's Damage Claims.**

PacBell argues that assuming Pastrana's prior felony conviction does not constitute good cause, the company was justified in terminating Pastrana because of subsequently discovered wrongdoing.  (*PacBell's MSJ*, 22:16–23:9.)  The Court agrees.

In order to prevail against the Union and PacBell, Pastrana must establish that the Union breached its duty of fair representation **and** that PacBell lacked good cause to discharge him.  Bliesner v. Communication Workers of Am., 464 F.3d 910, 913–914 (9th Cir. 2006).  Where an employer seeks to rely upon after-acquired evidence of wrongdoing to justify the termination, the employer must establish "that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."  McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 362–363 ( 1995).

After Pastrana was terminated, PacBell discovered two separate incidents of wrongdoing. PacBell argues that either incident justified his termination.  The first incident involved Pastrana's arrest on December 29, 1999 for possession of methamphetamines.  (*PacBell's Sep State*, MF 47.)  As a result of his arrest, Pastrana did not report to work on December 30 and 31.  (*Id.*, MF 48.)  Rather than request personal time off for the absences, Pastrana's girl friend contacted PacBell and stated that he had a cold, thereby enabling Pastrana to be paid for the absences.  (*Id.*)

Pastrana argues that the incident does not qualify as good cause for two reasons. First, Pastrana contends that he was unaware that his girlfriend lied about him having a cold.  However, after Pastrana returned to work, he was reminded about the reason given for his absence.  (*PacBell's Sep State.*, MF 49.)  Despite learning about his girlfriend's misrepresentation, Pastrana said nothing and accepted payment for the days missed.  (*Id.*)

Pastrana next argues that PacBell has not established that the misrepresentation would have led to his termination.  But PacBell provided evidence that while Pastrana was employed, PacBell discharged eight of nine employees who falsified the reason for missing

06cv1779W

1   work in order to get paid.  (*PacBell's Sep. State.*, MF 51–53.)  Such evidence is persuasive in

2   establishing that the employer would have terminated the employee.  <u>O'Day v. McDonnell</u>

3   <u>Douglas Helicopter Co.</u>, 79 F.3d 756, 762 (9th Cir. 1996)

4          PacBell also argues that Pastrana would have been terminated for misrepresenting

5   that he was still married to his ex-wife, Jennie Pastrana, so that she could receive medical

6   benefits.  There is no dispute that only eligible Class I dependents, such as spouses and

7   children, are eligible for company medical, dental and vision benefits.  (*PacBell's Sep State*,

8   MF 54.)  Nor is there any dispute that Alberto Pastrana and Jennie Pastrana divorced more

9   than four years before he began working at PacBell.  (*Id.*, MF 58.)  Nevertheless, he

10  identified her as his "spouse" and  enrolled her on his benefits plan. (*Id.*, MF 56).  As a

11  result, PacBell paid over $11,790 in benefits from November 1997 until Pastrana's

12  termination in February 2005.  (*Id.*, MF 60.)  PacBell contends that Pastrana's deception

13  violated the company's Code of Business Conduct and, when discovered, would have

14  resulted in his termination.  (*Id.*, MF 61, 62; *PacBell's MSJ*, 25:11–14, citing <u>Southwestern</u>

15  <u>Bell Tel. Co.</u>, 95 Lab. Arb. (BNA) 46 (1990).)

16         Pastrana does not dispute that he misrepresented his ex-wife's status in order to

17  obtain benefits, but instead asserts that PacBell failed to prove that it would have

18  terminated him.  But Pastrana offers no evidence supporting his contention, nor does he

19  offer any evidence refuting PacBell's claim that he violated the company's code of conduct

20  or that it would have terminated him.  Moreover, given the amount stolen–over $11,000

21  in benefits–the Court is persuaded that PacBell would have terminated Pastrana.

22         Finally, assuming that PacBell would not have terminated Pastrana for one of his

23  violations, there can be little doubt that PacBell would have terminated Pastrana after

24  discovering both of his violations.  Accordingly, Pastrana's damage claims are limited to

25  the period from his termination until PacBell discovered his wrongdoing.  <u>See</u> <u>McKennon</u>,

26  513 U.S. at 362.

27

28

06cv1779W

1     **E.**    <u>Penal Code Claim</u>

2       Pastrana claims that PacBell violated California Penal Code § 290.46 by using his

3 conviction information found on the Megan's Law website as the basis for an employment

4 decision.[7] PacBell argues that they are exempt from section 290.46's prohibition because

5 Pastrana's job involved entering private residences, and PacBell is a public utility. The

6 Court agrees.

7       Section 290.46(l) prohibits the use of information disclosed by the Megan's Law

8 website for any purpose related to employment. Penal Code § 290.46(l)(2)(E). However,

9 section 290.46(l) includes an exception for the "authorized access to, or use of, information

10 pursuant to, among other provisions, Sections 11105. . . ." <u>Id.</u> § 290.46(l)(3). Section

11 11105 requires the Department of Justice to "maintain state summary criminal history

12 information" and provides that it may furnish this criminal history to any public utility.

13 Penal Code § 11105(a)(c)(10)(A). The section also allows the public utility to use the

14 criminal history information to fulfil "employment, certification, or licensing duties." <u>Id.</u>

15 § 11105(c). Specifically, non-nuclear public utilities may use the information "to assist in

16 employing current or prospective employees, contract employees, or subcontract

17 employees who, in the course of their employment may be seeking entrance to private

18 residences or adjacent grounds." <u>Id.</u> § 11105(c)(10)(A).

19       It is undisputed that Pastrana's job duties required him to enter private residences

20 in order to make repairs and conduct service. (*PacBell's Sep State*, MF 34.) It is further

21 undisputed that PacBell is a public utility as defined in Public Utilities Code § 216.

22 Therefore, PacBell had the right to obtain Pastrana's information directly from the

23 Department of Justice under Penal Code sections 290.46(l)(3) and 11105(c)(10)(A).

24       Pastrana nevertheless argues that PacBell violated section 290.46 (l)(2)(E) because

25 it never obtained his conviction information directly from the Department of Justice, only

26 from the Megan's Law website. This argument lacks merit.

27

28       [7]Unless otherwise indicated, all statutory references in this section are to the California Penal Code.

06cv1779W

The Megan's Law website was developed and is maintained by the Department of Justice. Penal Code § 290.46(a)(1) ("On or before the dates specified in this section, the Department of Justice shall make available information concerning persons who are required to register pursuant to Section 290 to the public via an Internet Web site as specified in this section."). As a result, the United States Supreme Court has noted that a visit to this type of website is "analogous to a visit to an official archive of criminal records." See Smith v. Doe, 538 U.S. 84, 99 (2003) (holding that because the conviction information is already available to the public, making the process more efficient, cost efficient, and convenient cannot be an *ex post facto* punishment).

PacBell was entitled to obtain the information regarding Pastrana's conviction from the Megan's Law website. The Court cannot condemn PacBell for using a readily available public service to find Pastrana's conviction information when they could have obtained the exact same information from the Department of Justice directly. Moreover, PacBell did not rely solely on the information found on the website. PacBell employees further confirmed with Pastrana that he had, in fact, been convicted of the particular crime mentioned on the website. The appearance of Pastrana's name on the website merely served, in this case, to provide PacBell with notice that one of their customer-facing employees had a sexual offense conviction on his record. The fact that this notification resulted in an investigation and Pastrana's eventual termination does not result in a violation of section 290.46. PacBell was exempted from that provision by section 11105(c)(10)(A) and therefore cannot be held liable for its use of the Website.[8]

## IV.   CONCLUSION

---

[8]PacBell argues that because Pastrana's third cause of action is premised on the Penal Code § 290.46 violation, dismissal of the Penal Code claim also results in dismissal of the third cause of action. Pastrana does not address this issue in his opposition. The Court agrees with PacBell. See Hanson v. Lucky Stores, Inc., 74 Cal.App.4th 215, 229 (1999) (dismissing claim for wrongful termination in violation of public policy because predicate FEHA violation claim failed.).

In light of the foregoing, the Court **GRANTS IN-PART** and **DENIES IN-PART** Defendants' summary-judgment motions and **ORDERS** as follows:

- Defendant PacBell's Request for judicial notice is granted.
- Summary judgment is denied as to Pastrana's first cause of action.
- Summary judgment is granted as Pastrana's second and third causes of action.
- Based on the after-acquired evidence doctrine, Pastrana's damage claims are limited to damages from the date he was discharged to the date PacBell discovered Pastrana's wrongful conduct, as set forth in section III.D.

**IT IS SO ORDERED.**

DATED:  November 19, 2008

_____
Hon. Thomas J. Whelan
United States District Judge

06cv1779W

- 21 -